**WEATHERCHEM CORPORATION,**
**Plaintiff–Appellant,**

v.

**J.L. CLARK, INC., Defendant/Cross–**
**Appellant.**

Nos. 98–1064, 98–1078.

United States Court of Appeals,
Federal Circuit.

Dec. 7, 1998.

---

Robert V. Vickers, Vickers, Daniels & Young, Cleveland, Ohio, for plaintiff-appellant. Of counsel was Scott A. McBain.

John W. Kozak, Leydig, Voit & Mayer, Ltd., Chicago, Illinois, for defendant-cross appellant. With him on the brief were H. Michael Hartmann and Christopher T. Griffith.

Before MAYER, Chief Judge, MICHEL, and RADER, Circuit Judges.

RADER, Circuit Judge.

In this patent infringement action, Weatherchem Corporation (Weatherchem) asserted that J.L. Clark, Inc. (Clark) infringed U.S. Patent Nos. 4,693,399 (the '399 patent) and 4,936,494 (the '494 patent). Clark counterclaimed for a declaratory judgment of invalidity, unenforceability, and noninfringement. After a bench trial, the district court entered judgment declaring both patents invalid, holding the '494 patent not infringed, and dismissing Weatherchem's claims for infringement. *See* 937 F.Supp. 1262, 1290 (N.D.Ohio 1996). The district court's opinion also implicitly denied Clark's counterclaims for a declaration of unenforceability for both patents, *see id.* at 1262, 1293–94, 1296, and for a declaration of noninfringement of the '399 patent, *see id.* at 1290–92. For the reasons set forth below, this court affirms-in-part, modifies-in-part, and vacates-in-part.

## I.

Weatherchem is the assignee of the '399 and '494 patents. Both patents claim inventions on two-flap, shake-and-spoon plastic caps. These plastic caps usually fit on containers for spices and other condiments. One flap covers a plurality of small holes for shaking the spice or other product from the container. The other flap covers a relatively large opening which allows a spoon to enter and remove product from the container. The '399 patent explains that prior-art cap designs had a spoon opening that covered less than half the mouth opening of the container, making it difficult to extract product with a normal-sized spoon. Thus, cap designs strive to achieve a wider spoon opening. Larger spoon openings in prior art designs, though, caused problems. In particular, a cap with a large spoon opening tends to take an oval shape when released from the mold. As the cap cools upon release from the mold, the substantial amount of plastic on the shake side shrinks at a different rate from the open spoon side. The result is some disfiguring. After disfiguring, these caps rarely achieve a good seal with the mouth of the container. Moreover, these disfigured oval flaps often pop open when the cap is screwed onto the container during manufacture.

The '399 patent includes several design enhancements to address these problems. For instance, the cap disclosed in the '399 patent includes a "wide internal sealing ledge which ensures that the closure will positively seal the mouth of a container, regardless of any expected degree of ovality." Col. 2, ll. 3–6. The cap further includes a "land area between the spoon and shake apertures [having] the same elevation as the sealing ledge." '399 patent, col. 2, ll. 6–7. This land area provides intermediate support for a safety-seal liner used in conjunction with the cap.

Claim 12 of the '399 patent reads:

A two-mode dispensing cap for a container comprising an injection-molded thermoplastic one-piece body, the body having a generally circular end wall, the end wall having a spoon dispensing side and a shake dispensing side ... a chordal land area between the spoon and shake sides, each of said sides having an associated flap hinged on said land ... an internally threaded skirt depending from the perimeter of said end wall, an annular sealing ledge on the lower side of the end wall interior of said skirt, *the land area having a lower surface generally coplanar with said sealing ledge and adapted to cooperate with said sealing ledge to support a sealing sheet received in said cap.*

(emphasis added). For purposes of this opinion, claim 13 is substantially similar to claim 12, except that it replaces the portion emphasized in claim 12 above with the following: *the sealing ledge having a flat surface extending radially a distance substantially equal to at least twice the nominal wall thickness of the cap.*

Figures 1 and 2 of the '399 patent illustrate an embodiment of the claimed invention:

FIG.1

FIG.2

The '399 specification identifies feature 51 as an "annular sealing ledge" and contains the following description:

As shown in FIG. 2, the lower or inside face of the end wall 13 includes an annular sealing ledge 51. The ledge 51 is generally planar and is relatively wide in the radial direction, preferably having a radial dimension generally equal to twice the nominal wall thickness of the cap 10. The relatively wide extent of the ledge 51 ensures that the cap 10 will produce a reliable seal on the mouth of a container on which it is assembled, despite any expected degree of ovality. A lower face 52 of the land area 16 includes a pair of ribs 53 parallel to the hinges 23, 36. Lower surfaces 54 of the ribs 53 are coplanar with the sealing ledge 51 and help support any paper, foil, or like sealing film stamped or otherwise set into the cap 10 prior to assembly with its container.

Col. 6, ll. 9–23. According to the district court, whereas prior art caps required extra steps to provide containers with safety-seal liners, the claimed invention, with its annular sealing ledge, allowed manufacturers to "simply insert a safety-seal liner into the cap, and screw the cap onto the container." 937 F.Supp. at 1271.

The '494 patent, filed more than ten months after the '399 patent issued, also discloses a two-flap, shake-and-spoon cap for condiment containers. The '494 cap differs from the '399 cap primarily in the way the cap forms a seal with the container. Figures 2 and 5 of the '494 patent show a cap with an annular sealing surface (36) inside the cap's skirt (11). This sealing surface engages and seals with the container's circular wall. Because the portion of the container's end wall (12) between the sealing surface (36) and the skirt (11) may deflect slightly when the cap is threaded tightly onto the container, the cap also includes a plurality of peripherally spaced, radially extending ribs (71). These ribs extend between the sealing surface and the skirt to resist deflection and prevent malfunction of the cap.

FIG.2

FIG.5

Claim 13 represents well the claims at issue:

In combination, a container adapted to be filled with granular material and having a mouth with threads extending around said mouth substantially adjacent thereto, a dispensing cap for said container consisting of an injection-molded plastic one-piece body providing a circular end wall and a cylindrical skirt having thread means engaging the threads of said container, said end wall providing at least one opening therein through which contents of said container can be removed without removing said cap from said container, said body providing a hinged flap operable to close said opening, said end wall and flap providing latch means for holding said flap closed, said cap providing a sealing surface inwardly spaced from said cylindrical skirt engaging said mouth of said container and forming a seal therewith, the periphery of said end wall being subjected to a force substantially normal to said end wall when said cap is tightened onto said container tending to cause deflection of said end wall and tending to cause said latch means to malfunction, and a plurality of reinforcing ribs extending below said end wall radially between said sealing surface and said skirt, said reinforcing ribs being disposed on the inner periphery of the skirt at a multitude of relatively closely spaced locations, said sealing surface being a circumferentially continuous annulus spaced radially inward of the ribs and lying in a flat plane whereby said reinforcing ribs provide an anchoring action for said end wall and sealing surface by imparting the inherent stiffness of the cylindrical skirt, and indirectly the container mouth portion threaded onto it, to the end wall and sealing surface to resist deflection of said periphery of said end wall to prevent malfunction of said latch means.

The '399 patent is the result of a cap design project Weatherchem began in late 1984 for a company known as Durkee Foods. 937 F.Supp. at 1271. According to the district court, Weatherchem and Durkee exchanged designs on possible cap configurations for several weeks into early 1985. By February 8, 1985, Weatherchem had produced a drawing of a cap design entitled "Durkee Concept T2 Cap, Revision B." At trial, Mr. Hickman, a Weatherchem employee and co-inventor of the '399 patent, admitted that "the features of the patent claims can all be found in [the 2–8–85 drawing]."

The record shows that on February 19, Durkee issued a purchase order to Weather-

chem for 500 caps "per your drawing Durkee # T-2 cap, Revision B dated 2-8-85." In response, Weatherchem issued an "Acceptance of Order" on May 13, 1985, noting it would charge Durkee $300 for the samples. The record also shows that on July 17, 1985, Durkee ordered 990 more "sample caps." Durkee evaluated these caps and notified Weatherchem on August 15, 1985 that "ovality of the bottom edge of the cap skirt is unacceptable." The next day, Weatherchem quoted to Durkee a firm price on a quantity of 500,000 caps. In a letter to Durkee dated August 23, 1985, Weatherchem outlined its plans to modify its mold to address the "ovality" problem and stated that it "expect[ed] to have all refinement work completed ... by the week of September 16." On September 3, 1985, Durkee issued a purchase order for 275,000 caps at the quoted price "as per mold revised in accordance with our ... letter of 8/15/85." The record shows that full production is about 440,000 caps per week.

Durkee wrote Weatherchem on October 11 to confirm further specific changes in the mold design. A few days later, Weatherchem sent Durkee an invoice for additional tool work on the mold. On October 16, Durkee responded, asserting that Weatherchem should bear the cost of the additional tool work because these modifications to the mold constitute "fine tuning" for "expected acceptable cap performance."

Thereafter, according to the district court findings, Weatherchem "continued to work out some 'kinks' in the cap mold." See 937 F.Supp. at 1272. Only on January 3, 1986 did Weatherchem begin regular mass production of caps for Durkee. See id. Approximately ten documents in the record detail the final two-and-a-half months of adjustments to the design before Weatherchem began full production. According to the district court, these documents show "that none of the changes to the cap mold made after September 19, 1985 (at the latest) were directed to the problem of ovality. None of the changes were ever addressed specifically to the chordal land area or the annular sealing ledge portions of the cap." See id. at 1276.

Weatherchem filed a patent infringement action against Clark in the United States District Court for the Northern District of Ohio asserting infringement of claims 12 and 13 of the '399 patent, and claims 9, 13, and 14 of the '494 patent. In a counterclaim, Clark sought to show that the patents are unenforceable and that the asserted claims are invalid and not infringed by Clark's caps.

After a bench trial, the district court held the asserted claims of the '399 patent invalid because the invention was on sale "at the very latest, in late September 1985." See id. at 1277. Because the '399 patent issued from an application filed on October 17, 1986, the critical date for the on-sale bar is October 17, 1985. In addition, the district court found the asserted claims of the '494 patent invalid for obviousness over the '399 patent in combination with a cap used by the Rosam Spice company to seal its glass spice containers (the Rosam II cap). See id. at 1286-89. According to the district court, the Rosam II cap meets all the limitations of the '494 patent claims except that it has two sprinkle openings instead of a sprinkle opening and a spoon opening. See id. at 1288. The '399 patent, however, explicitly teaches a sprinkle opening and a spoon opening. Thus, the district court found that one of skill in the art would have found it obvious to solve the problem of a cap that deflected when screwed onto a container with very high torque by combining the designs of the Rosam II cap and the '399 patent. Id. at 1289.

The district court opined that these judgments would dispose of all claims and counterclaims in this case. Nevertheless, "for completeness and in the interest of aiding appellate review," the district court addressed other issues as well. In this vein, the district court determined that Clark infringed the '399 patent, but not the '494 patent. See id. at 1290-92. Further, the district court found that Weatherchem did not engage in inequitable conduct in obtaining either patent. See id. at 1293-94, 1296. In addition, the district court denied Weatherchem's motions under Fed.R.Civ.P. 52(b) seeking amendments in the trial court's on-

sale bar findings and construction of the '494 patent claims.

On appeal, Weatherchem contests the district court's construction of both patents' claims, its conclusions on validity, and its conclusion of no infringement of the '494 patent. Weatherchem finally contends that the district court abused its discretion in denying Weatherchem's Rule 52(b) motions. Clark cross-appeals, asserting error in the district court's findings of infringement of the '399 patent and of no inequitable conduct.

## II.

■ Whether premature acts to commercially exploit a patented invention render the patent invalid is a question of law based on underlying issues of fact. *See Ferag AG v. Quipp, Inc.,* 45 F.3d 1562, 1566, 33 USPQ2d 1512, 1514–15 (Fed.Cir.1995). Thus, in an appeal from a bench trial, this court reviews the ultimate determination without deference, but all subsidiary fact findings for clear error. *See id.*

■ Similarly, this court reviews an obviousness invalidation without deference. *See Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.,* 976 F.2d 1559, 1572–73, 24 USPQ2d 1321, 1332–33 (Fed.Cir. 1992). That determination, too, however, invariably rests on factual underpinnings that this court reviews, if disputed, for clear error. *Id.* These factual predicates include: (1) the scope and content of the prior art, (2) the differences between the prior art and the claims, (3) the level of ordinary skill in the pertinent art, and (4) applicable secondary considerations. *See Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

## III.

### A. The '399 Patent and the On–Sale Bar

The Supreme Court has recently addressed the standards for application of the on-sale bar. *See Pfaff v. Wells Elecs.,* *Inc.,* —— U.S. ——, 119 S.Ct. 304, —— L.Ed.2d —— (1998). In *Pfaff,* the inventor showed detailed engineering drawings of his computer chip socket invention to Texas Instruments. Before the critical date, Texas Instruments provided the inventor with a written order for over 30,000 of his new sockets. In accord with the inventor's normal practice, he had not made any prototypes before offering his invention for commercial sale. After receiving Texas Instruments' purchase order, the inventor set out to make the device in commercial quantities. The inventor did not reduce his invention to practice or fill Texas Instruments' order until after the critical date. The Supreme Court determined that "the invention had been on sale for more than one year in this country before [the inventor] ... filed his patent application." *Id.* at ——, 119 S.Ct. at 306.

■ The facts of *Pfaff* required the Supreme Court to address "whether the commercial marketing of a newly invented product may mark the beginning of the 1–year period even though the invention has not yet been reduced to practice." *Id.* at ——, 119 S.Ct. at 307. In addressing this question, the Supreme Court first examined precedents governing the completion of an invention. Then the Court stated:

> We conclude, therefore, that the on-sale bar applies when two conditions are satisfied before the critical date.
>
> First, the product must be the subject of a commercial offer for sale....
>
> Second, the invention must be ready for patenting. That condition may be satisfied in at least two ways: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention.

*Id.* at —— – ——, 119 S.Ct. at 306–07. Applying the first part of the test, the Supreme Court found:

In this case the acceptance of the [Texas Instrument] purchase order ... makes it clear that such an offer had been made, and there is no question that the sale was commercial rather than experimental in character.

*Id.* at ——, 119 S.Ct. at 306. Applying the second part of the test, the Supreme Court found:

In this case the second condition of the on-sale bar is satisfied because the drawings [the inventor] sent to the manufacturer before the critical date fully disclosed the invention.

*Id.* at ——, 119 S.Ct. at 307.

The Supreme Court also observed that the Patent Act's on-sale and public use provisions strive to provide "inventors with a definite standard for determining when a patent application must be filed." *Id.* at ——, 119 S.Ct. at 311. In this context, the Supreme Court counseled against the multifactor "totality of the circumstances" test as a trigger for the on-sale bar, crediting this court for criticizing such a trigger "as unnecessarily vague." *Id.* at —— n. 11, 119 S.Ct. at 311 n. 11. Accordingly, this court follows the Supreme Court's two-part test without balancing various policies according to the totality of the circumstances as may have been done in the past. *See, e.g., Envirotech Corp. v. Westech Eng'g, Inc.,* 904 F.2d 1571, 1574, 15 USPQ2d 1230, 1232 (Fed.Cir.1990); *UMC Elecs. Co. v. United States,* 816 F.2d 647, 656, 2 USPQ2d 1465, 1472 (Fed.Cir.1987); *King Instrument Corp. v. Otari Corp.,* 767 F.2d 853, 860, 226 USPQ 402, 406 (Fed.Cir.1985).

Because application of the on-sale bar rests on underlying facts, *see Kolmes v. World Fibers Corp.,* 107 F.3d 1534, 1540, 41 USPQ2d 1829, 1832 (Fed.Cir.1997), this court examines the findings of the district court in our application of the Supreme Court's test. First, this court examines the trial court's findings with respect to the first part of the two-part Supreme Court test. The district court found "an actual sale" to Durkee in 1985 in which "money changed hands."

Upon review, the record shows that Weatherchem received the benefit of at least three commercial transactions with Durkee before the critical date: Durkee ordered 500 caps on February 19, 1985, for which Weatherchem noted a $300 charge; 990 caps on July 17, 1985; and 275,000 caps on September 3, 1985, based on a price quoted by Weatherchem of $156.04 per thousand. The last of these transactions constituted at least an offer for sale, if not an outright commercial sale transaction, which Durkee accepted. It is immaterial that the record shows no delivery of the later patented caps and no exchange of money until after the critical date. Record evidence of a signed purchase agreement before the critical date establishes an offer for sale sufficient to invoke the on-sale bar. *See Pfaff,* at ——, 119 S.Ct. at 306. Thus, the findings of the district court satisfy the first part of the two-part test for an on-sale bar. This court certainly finds no clear error in such findings.

The only remaining question is whether the invention was ready for patenting at the time of Weatherchem's premature sale or offer for sale. On this point, the district court found that the caps Weatherchem prematurely sold or offered for sale had all the limitations of the invention as later claimed. Mr. Hickman testified, for example, that the 2–8–85 drawing showed a cap having all the structural limitations of the claims. Indeed, the only claim element now alleged by Weatherchem to be missing from that drawing is a "sealing" ledge. Mr. Hickman testified on redirect, however, that the 2–8–85 drawing depicted a sealing ledge. Like the drawings in *Pfaff,* these detailed drawings of the cap design contained each limitation of the claims and "were sufficiently specific to enable a person skilled in the art to practice the invention." *Id.* at ——, 119 S.Ct. at 307.

The record also shows that Weatherchem produced several sample caps with ovality problems after the 2–8–85 drawing. Indeed on August 23, 1985, Weatherchem wrote to Durkee outlining changes in its mold to correct problems. Rather than showing that Weatherchem's invention, as depicted in the

2–8–85 drawing, was not ready for patenting, these record facts illustrate "that an invention [can be] ... complete and ready for patenting before it has actually been reduced to practice." *Id.* at ——, 119 S.Ct. at 308. Indeed, in this case, Mr. Hickman testified that by February 1985 he had believed that he could make the design work. Further, in its August 23, 1985 letter, Weatherchem stated that it "expect[ed] to have all refinement work completed ... by the week of September 16." And in October, Durkee characterized modifications to the mold as "fine tuning" for "expected acceptable cap performance." This record evidence shows that the invention was ready for patenting at the time of its depiction in the 2–8–85 drawing, even though Weatherchem continued to fine-tune features not claimed in the patent.

Two other important record facts show that the invention was ready for patenting. Durkee ordered a commercial quantity of the invention (275,000 caps) before the critical date thus showing its confidence that the invention was complete and operative. Moreover, as in *Pfaff,* "[t]he fact that the manufacturer was able to produce [the invention] ... using [the] ... detailed drawings and specifications demonstrates this fact." *Id.* at ——, 119 S.Ct. at 312.

Weatherchem also attempts to characterize its relationship with Durkee as a "development project" cloaked in secrecy, presumably to negate an on-sale bar by invoking the experimental use doctrine. *See TP Labs., Inc. v. Professional Positioners, Inc.,* 724 F.2d 965, 971–73, 220 USPQ 577, 582–83 (Fed.Cir.1984). The district court, however, explored several factors supporting its holding that Weatherchem was not jointly experimenting with Durkee. *See* 937 F.Supp. at 1277. This court discerns no clear error in the district court's findings on this issue, and agrees with its conclusion that Weatherchem did not show experimental use of the caps. Thus, the record supplies adequate support for the district court's conclusion that Weatherchem impermissibly placed the patented invention on sale before the critical date.

### B. The '494 Patent and Obviousness

An applicant may not obtain a patent for subject matter which, at the time of inven-

tion, would have been obvious to one of ordinary skill in the art. 35 U.S.C. § 103(a) (1998). Obviousness is ultimately a determination of law based on underlying determinations of fact. *See Richardson–Vicks Inc. v. Upjohn Co.,* 122 F.3d 1476, 1479, 44 USPQ2d 1181, 1183 (Fed.Cir.1997). These underlying factual determinations include: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) the extent of any proffered objective indicia of nonobviousness. *See Graham,* 383 U.S. at 17–18, 86 S.Ct. 684.

■ The district court determined that the asserted claims of the '494 patent would have been obvious to one of skill in the art over the '399 patent and the Rosam II cap. Specifically, the district court found: "The principal difference between the '494 patent and the '399 patent is the addition of the radial ribs.... The function of these ribs is to stiffen the entire cap and limit flaps from popping open when the cap is screwed onto a container." 937 F.Supp. at 1288. The district court then found that the Rosam II cap "fully discloses the use of stiffening ribs in the same manner." *Id.* After properly discerning a motivation to combine the '399 patent and the Rosam II cap and considering secondary considerations of nonobviousness, the district court concluded that the '494 patent would have been obvious to one of skill in the art at the time of invention.

Weatherchem attacks the district court's conclusion on several grounds. First, Weatherchem claims that, because as many as twenty-five percent of the Rosam II caps were "unusable," they would not have taught the use of a multitude of ribs. This argument overlooks evidence that Florence Rosenstein, designer and user of the Rosam II cap, did in fact use millions of the Rosam II caps per year in her business. Thus, on the full record, this court cannot conclude that the district court clearly erred in implicitly finding that the Rosam II caps were operable and available as prior art.

Even accepting the Rosam II caps as prior art, however, Weatherchem contends that

they would not have taught two key elements of the claims: a sealing land or surface, and a plurality of ribs arrayed at relatively closely spaced locations. With regard to the sealing land, both Clark's expert and Mrs. Rosenstein testified that the Rosam II cap had a sealing land. The district court also examined the underside of the Rosam II cap and found "a circular land concentric with the skirt ... which seals against the lip of the container." 937 F.Supp. at 1288. This court declines to ignore this evidence in favor of testimony from Weatherchem's expert to the contrary, which, alone, does not and cannot meet its burden of showing clear error by the district court.

Regarding the plurality of ribs, Weatherchem argues that the district court erred in finding that the eight ribs on the Rosam II cap constituted a plurality of ribs at relatively closely spaced locations as claimed in claims 9, 13, and 14. According to Weatherchem's expert, more than ten ribs are necessary to stiffen the cap. The district court, however, also heard the testimony of Mrs. Rosenstein that the eight ribs of the Rosam II cap sufficed to prevent malfunction of the cap when it was screwed on very tightly. On this question of fact, the district court simply credited Ms. Rosenstein's testimony over the testimony of Weatherchem's expert. This court discerns no clear error in this.

Finally, Weatherchem argues that evidence of secondary considerations – namely, commercial success of the cap of the '494 patent, failure of others, and copying by others – supports a finding of nonobviousness. The district court determined, however, that the success of the cap made in accordance with the '494 patent was attributable mostly to the design elements disclosed in the prior art '399 patent. *See* 937 F.Supp. at 1289. Weatherchem does not cite sufficient evidence to show clear error in the district court's findings with respect to secondary considerations.

In short, this court does not find clear error in the district court's findings under the *Graham* factors. Nor can this court say

that, based on those findings, the district court erred in determining that the claims would have been obvious.

## IV.

■ Because this court affirms the determination of invalidity, this court vacates those portions of the judgment granting a declaration of noninfringement of the '494 patent and dismissing Clark's counterclaim for a declaration of noninfringement of the '399 patent. This court stops short of reviewing infringement even though Clark counterclaimed for a declaratory judgment of invalidity, unenforceability, *and* noninfringement. As this court observed in *Lough v. Brunswick Corp.*, 86 F.3d 1113, 1123, 39 USPQ2d 1100, 1107 (Fed.Cir.1996), a holding that claims are invalid eliminates, as a practical matter, the need to consider on appeal whether those claims are infringed, even if the accused infringer has filed a counterclaim for a declaratory judgment of noninfringement.

As explained in *Lough*, 86 F.3d at 1123, this approach is not at odds with the Supreme Court's decision in *Cardinal Chemical Co. v. Morton International, Inc.*, 508 U.S. 83, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993). In *Cardinal Chemical*, the Supreme Court disapproved of this court's routine practice of vacating a declaratory judgment of invalidity after determining, on appeal, that there was no infringement. *See* 508 U.S. at 99–103, 113 S.Ct. 1967. Due to the expense of litigating validity, the strong public interest in resolving validity questions, and the potential impact of the question beyond the immediate case, the Court advised that routinely refusing to address validity was improper.

■ Refusing to address infringement does not raise these same problems. Whereas invalidity operates as a complete defense to infringement for any product, forever, *see Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), a determination of infringement applies only to a

specific accused product or process. Thus, a vacatur of a declaratory judgment of noninfringement is essentially of no import when accompanied by an affirmance of a declaratory judgment of invalidity. Of course, in appropriate cases this court may address infringement after a conclusion of invalidity for the same reason that a district court may elect to do so – to aid appellate review and avoid a remand.

■ A declaration of unenforceability, as opposed to a declaration of noninfringement, can present a different story. Where, as here, a declaration of invalidity does not extend to all claims of a patent, a counterclaim for a declaration of unenforceability affects the entire patent. *See Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 877, 9 USPQ2d 1384, 1392 (Fed.Cir. 1988) (in banc) ("When a court has finally determined that inequitable conduct occurred in relation to one or more claims during prosecution of the patent application, the entire patent is rendered unenforceable."). In those circumstances, this court must review the issue if it is properly raised on appeal.

## V.

### Unenforceability of the '399 Patent

■ In its cross-appeal, Clark contends that the district court erred by not addressing whether Weatherchem's non-disclosure of its premature sale to the U.S. Patent and Trademark Office (PTO) during the pendency of the '399 patent constituted inequitable conduct. In its opinion, however, the district court did discuss Weatherchem's alleged inequitable conduct in the disclosure of prior art to the PTO. While not explicitly discussing Weatherchem's premature sales activities as inequitable conduct, the district court nonetheless found that Weatherchem had no intent to deceive: "Simply put, there was no evidence adduced by Clark supporting its allegation that Weatherchem ever had any intent to deceive the United States Patent Office during the prosecution of the '399 patent or in the related interference...." 937 F.Supp. at 1294.

The district court's failure to specifically mention the on-sale activities does not require this court to remand the case for further findings. The district court's broad finding that Weatherchem did not have "any intent to deceive" disposes of the inequitable conduct issue. Moreover, Clark has not come forward with evidence even approaching the level necessary to show that the district court's findings as to a lack of intent were clearly erroneous or that it abused its discretion in its ultimate finding of no inequitable conduct. *See Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178, 33 USPQ2d 1823, 1827 (Fed.Cir.1995).

## VI.

### Denial of Rule 52(b) Motions

■ Weatherchem contends that the district court abused its discretion in denying motions under Fed.R.Civ.P. 52(b) seeking to have the court amend its findings on the on-sale bar and interpretation of the '494 patent claims. Weatherchem's proposed amended findings, however, constituted nothing more than an invitation to the district court to reverse itself. On both issues, the district court's thorough and legally sound opinion fully disposed of the issues. Accordingly, in light of this court's decision, this court finds no abuse of discretion in the district court's denials of the Rule 52(b) motions.

## VII.

Finally, this court notes that, on its face, the district court's judgment declares both patents invalid. More accurately, the parties only adjudicated and the district court only determined the validity of the asserted claims. Therefore, this court slightly modifies the district court's judgment to reflect invalidity of only the asserted claims. *See Diversitech Corp. v. Century Steps, Inc.*, 850 F.2d 675, 677, 7 USPQ2d 1315, 1317 (Fed. Cir.1988); *Vandenberg v. Dairy Equip. Co.*, 740 F.2d 1560, 1568, 224 USPQ 195, 200 (Fed.Cir.1984); *Gardner v. TEC Sys., Inc.*, 725 F.2d 1338, 1339 n. 1, 220 USPQ 777, 778 n. 1 (Fed.Cir.1984).

## VIII.

For the foregoing reasons, judgment of the district court is affirmed-in-part, modified-in-part, and vacated-in-part. This court affirms the declaratory judgment of invalidity, but modifies it to encompass only claims 12 and 13 of the '399 patent and claims 9, 13, and 14 of the '499 patent. This court also affirms the dismissal of Weatherchem's infringement claims, as well as the denial of Clark's counterclaim for declaratory judgment of unenforceability. However, this court vacates the declaratory judgment of noninfringement of the '494 patent and the denial of Clark's counterclaim for a declaration of noninfringement of the '399 patent.

## COSTS

Each party shall bear its own costs.

*AFFIRMED–IN–PART, MODIFIED–IN–PART, AND VACATED–IN–PART*