# United States Court of Appeals for the Federal Circuit

2008-1332

CLOCK SPRING, L.P.,

Plaintiff-Appellant,

v.

WRAPMASTER, INC., APPLIED CONSULTANTS, INC.,
and GLENN DAVIS (personally and including his marital estate),

Defendants-Appellees.


Tim Headley, Law Offices of Tim Headley, of Houston, Texas, argued for plaintiff-appellant.

William L. Prickett, Seyfarth Shaw LLP, of Boston, Massachusetts, argued for the defendants-appellees. With him on the brief was Jason J. Jarvis. Of counsel on the brief were William G. Arnot, III and Ira P. Domnitz, Winstead Attorneys, of Houston, Texas.

Appealed from: United States District Court for the Southern District of Texas

Judge Vanessa D. Gilmore

# United States Court of Appeals for the Federal Circuit

2008-1332

CLOCK SPRING, L.P.,

Plaintiff-Appellant,

v.

WRAPMASTER, INC., APPLIED CONSULTANTS, INC.,
and GLENN DAVIS (personally and including his marital estate),

Defendants-Appellees.

Appeals from the United States District Court for the Southern District of Texas
in case no. 05-CV-0082, Judge Vanessa D. Gilmore.

_____

DECIDED: March 25, 2009

_____

Before BRYSON and DYK, <u>Circuit Judges</u>, and PATEL, <u>District Judge</u>.[*]

DYK, <u>Circuit Judge</u>.

Clock Spring, L.P. ("Clock Spring") brought suit alleging that Wrapmaster, Inc.

("Wrapmaster") infringed the claims of U.S. Patent No. 5,632,307 ("'307 Patent") and

violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A). The '307 Patent

claims methods for repairing damaged high-pressure gas pipes. On summary judgment

_____

[*]    The Honorable Marilyn H. Patel, United States District Court Judge for the
Northern District of California, sitting by designation.

the United States District Court for the Southern District of Texas held that the claims of the '307 Patent were invalid due to obviousness and that the Lanham Act claim was without merit. We affirm the summary judgment of invalidity because we conclude that the claims of the '307 Patent are invalid as a matter of law, due to prior public use. We do not reach the issue of invalidity due to obviousness. Additionally, we affirm the district court's summary judgment determination that the false advertising claim is without merit.

BACKGROUND

Both Clock Spring and Wrapmaster are high-pressure gas pipeline repair companies. Clock Spring is the exclusive licensee of the '307 Patent. The '307 Patent has five independent claims and thirty-eight dependent claims. All are method claims. Claim 1 of the '307 Patent reads as follows:

> A method for repairing a pipe adapted to carry an internal load directed radially outward therefrom, <u>said pipe having a defective region</u> defined by at least one cavity extending from an outer surface of said pipe toward the center of said pipe but not extending completely through the wall of said pipe, said method comprising the steps of:
>
> > providing a filler material <u>having a workable uncured state</u> and a rigid cured state,
> >
> > <u>filling said cavity to at least said outer surface of said pipe with said filler material in said workable state</u>,
> >
> > providing at least one band having a plurality of elastic convolutions of high tensile strength material,
> >
> > <u>while said filler material is in said workable state</u>, wrapping said plurality of convolutions of said high tensile strength material about said pipe to form a coil overlying stud filler material[,]
> >
> > tightening said coil about said pipe so that said filler material completely fills that portion of said cavity underlying said coil[,]

securing at least one of said convolutions to an adjacent one of said convolutions, and

permitting said filler material to cure to said rigid state, whereby a load carried by said pipe is transferred substantially instantaneously from said pipe to said coil.

'307 Patent col.12 ll.9-34 (emphases added). The parties appeared to agree, or at least not contest, that the main distinctive feature over the prior art is wrapping the pipe while the filler is in an uncured state so as to ensure smooth and continuous contact between the wrap and the pipe. The other independent claims (claims 38, 39, 42, and 43) also require wrapping in an uncured state, but address different types of defects and repair methods. The various dependent claims add further limitations for the properties of the materials used in the individual steps of the method (e.g., requiring that the filler's "rigid cured state has a compressive strength of at least about 9,000 psi"). '307 Patent col.12 ll.59-60.

In 2005 Clock Spring filed an infringement suit against Wrapmaster alleging infringement of all the claims of the '307 Patent. It also filed a separate Lanham Act suit alleging that Wrapmaster "used in commerce a false and misleading description of fact, and false and misleading representation of fact, which in commercial advertising or promotion, misrepresents the nature, characteristics and qualities of [Clock Spring's] goods, services, and commercial activities." Pl.-Appellant's Compl. at 30, Clock Spring, L.P. v. Wrapmaster, Inc., No. 4:05-CV-01388 (S.D. Tex. April 20, 2005). The two suits were consolidated.

After discovery, Wrapmaster filed a summary judgment motion of invalidity of all the claims of the '307 Patent and a separate summary judgment motion on the Lanham

Act claim. Somewhat surprisingly, neither motion was supported by expert affidavits. We treat the two motions separately.

The invalidity summary judgment motion argued that the claims were invalid due to a prior public use under 35 U.S.C. § 102(b) in October 1989, in Cuero, Texas, more than one year before the patent application was filed in 1992. The motion was supported by a 1994 Gas Research Institute ("GRI") report (hereinafter "1994 GRI report") regarding the demonstration made by named inventor Norman C. Fawley ("Fawley").[1] GRI, since renamed the Gas Technology Institute, is a non-profit research and development organization which was entitled to receive royalty payments from Clock Spring on the '307 Patent. The motion also urged that the claims were invalid on grounds of obviousness based on a number of prior art patents.[2]

Clock Spring opposed the motion. Clock Spring did not dispute that the 1989 demonstration was public, or that it involved the limitations of the patent with one exception. Clock Spring apparently urged that the 1989 demonstration had not involved the application of the wrap with an uncured filler, and that the use had been experimental. Clock Spring also urged that the patent claims were not obvious.

The district court referred the motion to a magistrate judge for recommendations. The magistrate judge recommended that the district court grant summary judgment of invalidity with respect to the claims of the '307 Patent.

---

[1]  Fawley also prepared this 1994 GRI report.

[2]  Wrapmaster relied upon Canadian Patent No. 2,028,524 to Fawley ("'524 Patent"); U.S. Patent No. 4,676,276 to Fawley ("'276 Patent"); U.S. Patent No. 4,756,337 to Settineri ("'337 Patent"); U.S. Patent No. 2,924,546 to Shaw; U.S. Patent No. 4,559,974 to Fawley; U.S. Patent No. 4,700,752 to Fawley; and U.S. Patent No. 4,559,974 to Fawley.

The magistrate judge first addressed Wrapmaster's contention that the '307 Patent is invalid due to prior public use. The magistrate judge concluded that the 1994 GRI report proved that there was no genuine issue of material fact regarding whether the filler compound was uncured when the wrap was applied to the pipe. The magistrate judge also rejected Clock Spring's argument that the use was experimental. Based on this, the magistrate judge recommended finding that the 1989 demonstration triggered the public use bar under 35 U.S.C. § 102(b). Clock Spring, L.P. v. Wrapmaster, Inc., No. 4:05-CV-00082, slip op. at 11-12 (S.D. Tex. Dec. 19, 2007).

The magistrate judge then addressed Wrapmaster's contention that the claims of the '307 Patent are invalid due to obviousness. In her analysis, the magistrate judge primarily relied upon the combination of the '524 Patent with the '337 Patent. The '524 Patent's claims closely follow most of the claims for methods of repairing a pipe from the '307 Patent with the notable exception of any limitation requiring wrapping the pipe while the filler material is still in its uncured state. Although directed at low-pressure pipelines, the '337 Patent teaches a method of repairing a pipe by applying a sealing tape, the first layer of which is a "conformable, tacky pressure-sensitive composition" that partially fills the hole in the pipe and then wrapping a curable resin-impregnated fabric over the patch. '337 Patent col.1 ll.59-60; id. at col.2 ll.10-11; id. at fig. 6. The magistrate judge concluded that the '337 Patent thus taught the technique for wrapping a pipe while the filler is in its "uncured state." Evidently finding a motivation to combine, the magistrate stated that the '337 Patent technique would be known to those having ordinary skill in the art, and that it would have been obvious to try on a high-pressure gas line. The magistrate judge recommended that the '307 Patent claims were invalid

due to obviousness over prior art patents. Clock Spring, No. 4:05-CV-00082, slip op. at 18-20.

On review in the district court Clock Spring objected to the magistrate judge's recommendations, now arguing that three limitations of the claims were not present in the 1989 demonstration—the uncured state limitation, the requirement that the pipe have a "cavity," and the requirement that the "filler" be applied to the "cavity." The "defective region" with a "cavity" is described in the specification as "pits," "crevices," "gouging," and "denting." '307 Patent col.1 ll.34-37; id. at col.5 ll.5-6. The district court did not address whether the 1989 demonstration included all claim limitations. In support of its argument on experimental use to the district court, Clock Spring submitted new evidence including additional GRI reports (some of which mentioned the 1989 demonstration) and a 28-page report by NCF Industries, Inc.[3] ("NCF report") concerning the 1989 demonstration. Though characterizing the late submission of these documents as "clearly improper," the district court considered them and concluded that Clock Spring had "raise[d] a fact question about whether the 1989 installation was experimental," relying on the NCF report, a 1993 GRI report, and a 1998 GRI report.[4] The district court did not explain why these reports raised a genuine issue of material fact. Clock Spring, No. 4:05-CV-00082, slip op. at 2 (S.D. Tex. Mar. 31, 2008). The district court thus rejected the magistrate's recommendation concerning the public use

---

[3] Fawley, one of the named inventors in the '307 Patent, was the president of NCF Industries, Inc.

[4] The exact exhibits referred to by the district court are docket entry #173 exhibit D at ¶ 16, which is the 1998 GRI report, and docket entry #173 exhibit F at 70, which appears to actually be docket entry #174 exhibit F, the 1993 GRI report. The two docket entries were both published after the patent application was filed. While the 1998 report does mention the Cuero, Texas demonstration, the 1993 report does not.

bar. Id. However, the district judge agreed with the magistrate judge as to obviousness and granted summary judgment of invalidity due to obviousness. Id.

The proceedings with respect to the Lanham Act claim also involved a summary judgment motion and a referral to the magistrate judge. Clock Spring's Lanham Act complaint seemed to allege that Wrapmaster had made false statements about a Clock Spring product. After Wrapmaster filed its motion for summary judgment on the Lanham Act claims, Clock Spring urged, apparently for the first time, that two statements Wrapmaster made about Wrapmaster's own product were materially misleading. The first statement was that a metal component in the Wrapmaster product "enhances the strength" of that product. The second statement was that the diamond-shaped pattern in the product ensures "the permanence of the installation." As to the first statement, the magistrate judge found that Clock Spring failed to provide any evidence of actual consumer deception, which is a required element of a claim of false advertising due to a materially misleading statement. Clock Spring, L.P. v. Wrapmaster, Inc., No. 4:05-CV-00082, slip op. at 11 (S.D. Tex. Feb. 12, 2008). As to the second statement, the magistrate judge found that Clock Spring failed to provide any evidence that the statement was materially misleading because Wrapmaster "submitted an uncontroverted affidavit . . . which [stated] that since 2004, '[t]he PermaWrap pipe wrap product has been redesigned,' and that the model that Dr. Leewis reviewed was 'a reject sample', which was 'not representative of the product sold to customers.'" Id. at 13 (second alteration in original). The district court agreed with the magistrate judge's recommendations on the two false advertising claims and granted summary judgment in favor of Wrapmaster. Clock Spring, No. 4:05-CV-00082 (S.D. Tex. Mar. 31, 2008).

2008-1332                                        7

Clock Spring timely appealed.  We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).  We review the district court's grant of summary judgment de novo.  AquaTex Indus., Inc. v. Techniche Solutions, 479 F.3d 1320, 1328 (Fed. Cir. 2007).

## DISCUSSION

### I

Although the district court granted summary judgment of invalidity on obviousness, Wrapmaster contends that the invalidity decision can be sustained on the separate ground of prior public use.  Relying on the 1994 GRI report and the NCF report, Wrapmaster contends that the 1989 demonstration was a public use of the method of claim 1 because the method was demonstrated to the public almost three years before the priority date of the '307 Patent application, September 9, 1992 (application 942,731).  We agree.

We may affirm a grant of summary judgment on a ground supported in the record but not adopted by the district court if we conclude that "there [wa]s no genuine issue as to any material fact and . . . the movant [wa]s entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see AquaTex, 479 F.3d at 1328.[5]

Under 35 U.S.C. § 102:

> A person shall be entitled to a patent unless . . . (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

---

[5]    See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2716 at 290 (3d ed. 1998) ("[The appellate court] can find another ground for concluding that the movant [for summary judgment] is entitled to judgment as a matter of law and ignore any erroneous basis that the district court may have employed.").

For a challenger to prove a patent claim invalid under § 102(b), the record must show by clear and convincing evidence that the claimed invention was in public use before the patent's critical date. See Adenta GmbH v. OrthoArm, Inc., 501 F.3d 1364, 1371 (Fed. Cir. 2007); Motionless Keyboard Co. v. Microsoft Corp., 486 F.3d 1376, 1383 (Fed. Cir. 2007); see also Pfaff v. Wells Elecs., Inc., 525 U.S. 55, 60 (1998). The critical date is "one year prior to the date of the application for patent in the United States," here September 9, 1991. See 35 U.S.C. § 102(b). "[A] public use includes any public use of the claimed invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor." Adenta, 501 F.3d at 1371 (quotation and alteration marks omitted). In order for a use to be public within the meaning of § 102(b), there must be a public use with all of the claim limitations. See Lough v. Brunswick Corp., 86 F.3d 1113, 1122 n.5 (Fed. Cir. 1996) ("Each claim of the patent must be considered individually when evaluating a public use bar.").

There is no dispute that the 1989 demonstration was public. In fact, representatives of several other domestic gas transmission companies were present at the demonstration, and there was no suggestion that they were under an obligation of confidentiality. This demonstration was accessible to the public. See Am. Seating Co. v. USSC Group, Inc., 514 F.3d 1262, 1267 (Fed. Cir. 2008) ("An invention is in public use if it is shown to or used by an individual other than the inventor under no limitation, restriction, or obligation of confidentiality.").

There is also no dispute that all the limitations of claim 1 were involved in the demonstration save for three. Clock Spring contends that three of the claim limitations of claim 1 were not met, namely, the requirements (1) that a corroded pipe "defined by

at least one cavity extending from an outer surface of said pipe toward the center of said pipe" be involved; (2) that "filler material" be used to fill the "cavity"; and (3) that the pipe be wrapped while the filler material is in an "uncured state." We are skeptical whether the first two issues were preserved since they were not raised before the magistrate judge. Even if they were preserved, Clock Spring's argument is without merit.

The 1994 GRI report and the NCF report both described the demonstration.[6] The NCF report states that "[t]he purpose of this demonstration . . . [was] to closely document the <u>entire process</u> of bell-hole repair and rehabilitation on a working pipeline." J.A. 2447 (emphasis added). Even though the NCF report stated that "[n]o serious pitting was in evidence," the captions of the report's photographs numbered 8, 9, 10, 16 and 17 describe "[p]inhole areas of corrosion" which appear to be cavities within the meaning of the claim. J.A. 2402-09. Although the report does not specifically state that the filler was used to fill the pinholes, applying filler to cavities would have been obvious, particularly in light of the express statement in the NCF report that the filler compound was intended to be "used to fill in pitted areas of pipe corrosion," J.A. 2393, and the fact that the whole purpose of the experiment was to demonstrate a method of "spot repair" of pipelines. We have held that the public use bar applies to obvious variants of the demonstrated public use. <u>Netscape Commc'ns Corp. v. Konrad</u>, 295 F.3d 1315, 1321 (Fed. Cir. 2002).

The 1989 demonstration also involved uncured filler. The patent applicant's January 17, 1995 Information Disclosure Statement to the PTO described the 1989

demonstration. Recounting the final three installations of the 1989 demonstration, it stated that "[e]mployees of Texas Eastern then installed the CLOCK SPRING bands around the pipeline before the filler material had cured to a rigid state." J.A. 2454. The 1994 GRI report also described the installation process as involving installation while the filler was in an uncured state, stating that this approach has been "adopted as standard installation practice in this program," and then describing the 1989 demonstration as a "field installation" of that process. Moreover, the detailed description of the 1989 demonstration in the NCF report proves that uncured filler was used. During the demonstration, three of the crews prepared the pipe using "splash zone compound"[7] and adhesive. J.A. 2437, 2441. Based on the ambient temperature range during the demonstration, the splash zone compound had a minimum cure time of one hour. Within three minutes after the crew began to apply the filler compound, the adhesive was applied, and the clock spring was wrapped around the pipe. As the magistrate judge concluded, the short elapsed time demonstrates that the filler was uncured. There is no evidence that the filler was not uncured. There is no genuine issue of material fact as to whether the alleged missing elements of claim 1 of the '307 Patent were part of the 1989 demonstration.

---

[6] Before the magistrate judge, Clock Spring argued that the reports could not be relied on because they were hearsay. That contention is not renewed on appeal.

[7] Splash zone compound is an epoxy "filler" that gas transmission companies had "considerable experience with" for filling defects when reinforcing pipe sections with steel sleeves. J.A. 1396. Clock Spring appears to argue that filler was not used in the 1989 demonstration because "no mention [in the 1994 GRI report] was made of any filler material being us[ed]," Appellant's Reply Br. 24; Clock Spring fails to mention that the NCF report and the January 17, 1995, Information Disclosure Statement explicitly describe the use of filler as part of the 1989 demonstration.

In the alternative, Clock Spring claims that the 1989 demonstration was an experimental use and not a prior public use.

The experimental use exception is not a doctrine separate or apart from the public use bar. EZ Dock, Inc. v. Schafer Sys. Inc., 276 F.3d 1347, 1351-52 (Fed. Cir. 2002). Rather, something that would otherwise be a public use may not be invalidating if it qualifies as an experimental use. Electromotive Div. of Gen. Motors Corp. v. Transp. Sys. Div. of Gen. Elec. Co., 417 F.3d 1203, 1211 (Fed. Cir. 2005) (limiting "experimentation sufficient to negate a pre-critical date public use or commercial sale to cases where the testing was performed to perfect claimed features, or . . . to perfect features inherent to the claimed invention"). In Allen Engineering Corp. v. Bartell Industries, Inc., we catalogued a set of factors that in previous cases had been found instructive, and in some cases dispositive, for determining commercial versus experimental uses. 299 F.3d 1336, 1353 (Fed. Cir. 2002). These factors include:

> (1) the necessity for public testing, (2) the amount of control over the experiment retained by the inventor, (3) the nature of the invention, (4) the length of the test period, (5) whether payment was made, (6) whether there was a secrecy obligation, (7) whether records of the experiment were kept, (8) who conducted the experiment, (9) the degree of commercial exploitation during testing, (10) whether the invention reasonably requires evaluation under actual conditions of use, (11) whether testing was systematically performed, (12) whether the inventor continually monitored the invention during testing, and (13) the nature of contacts made with potential customers.

Id. (quotation and alteration marks omitted). Though a prior commercial sale and not a prior public use was at issue in Allen Engineering, the factors explicated are equally relevant to an analysis of experimental use.

We have said that lack of control over the invention during the alleged experiment, while not always dispositive, may be so. Atlanta Attachment Co. v. Leggett

2008-1332                                                      12

& Platt, Inc., 516 F.3d 1361, 1366 (Fed. Cir. 2008). In that case, we held that a public use had occurred, finding "dispositive" the fact that the patentee "did not have control over the alleged testing," which was performed by its customer. Id. Clock Spring argues that Fawley, a named inventor, exercised tight control over the demonstration, as shown through the detailed reports made of the demonstration. But, the detailed reports do not provide evidence that Fawley controlled the demonstration. An independent observer "analyzed and recorded" the 1989 demonstration. Three of the eleven Clock Spring installations were done by the pipeline's personnel. None of these individuals was under Fawley's control or surveillance. We need not, however, rely on lack of control as establishing public use because we conclude that the use cannot qualify as experimental for other reasons.

A use may be experimental only if it is designed to (1) test claimed features of the invention or (2) to determine whether an invention will work for its intended purpose—itself a requirement of patentability. See In re Omeprazole Patent Litig., 536 F.3d 1361, 1373-75 (Fed. Cir. 2008). In other words, an invention may not be ready for patenting if claimed features or overall workability are being tested. But, there is no experimental use unless claimed features or overall workability are being tested for purposes of the filing of a patent application.[8] See EZ Dock, 276 F.3d at 1352, 1354; Weatherchem Corp. v. J.L. Clark, Inc., 163 F.3d 1326, 1333 (Fed. Cir. 1998) (stating

---

[8] To be sure, an applicant may in some circumstances elect to delay filing an application and continue testing until an actual reduction to practice has occurred; such testing may nonetheless be for the purpose of filing an application. Of course, it is clear from this court's case law that experimental use cannot negate a public use when it is shown that the invention was reduced to practice before the experimental use, even if an application has not yet been filed. See Omeprazole Patent Litig., 536 F.3d at 1372.

that the public use provision strives to provide "inventors with a definite standard for determining when a patent application must be filed" (quotation marks omitted)). Indeed, the experimental use negation of the § 102(b) bar only exists to allow an inventor to perfect his discovery through testing without losing his right to obtain a patent for his invention. See EZ Dock, 276 F.3d at 1352.

Clock Spring does not urge that refining the claim limitations was the subject of the 1989 demonstration. Rather, Clock Spring argues that the demonstration was experimental because the 1989 demonstration was designed to determine durability of the method, i.e., its suitability for the intended purpose. See City of Elizabeth v. Am. Nicholson Pavement Co., 97 U.S. 126, 136 (1877). The reports make no such explicit statement. The NCF report states that "[t]he purpose of this demonstration . . . was to demonstrate to Panhandle Eastern attendants and guests the steps of application and the ability of minimally-trained crews to make Clock Spring installations." J.A. 2447. The 1994 GRI report states that "[t]his demonstration was designed to familiarize pipeline personnel with the Clock Spring technology, and to begin training of maintenance personnel in the use of the coil pass installation method." J.A. 1441 (emphasis added). The demonstration was similarly described to the United States Patent and Trademark Office ("PTO") during prosecution, where the applicant stated that the purpose of the demonstration was to seek "input from people in the industry on the performance of the bands and the practicality of their installation techniques." J.A. 2452.

To be sure, the 1994 GRI report can be read as suggesting that the 1989 demonstration was for durability testing because it states that "recovery and analysis of

installed composite after several years of exposure in pipeline settings was the only means of verifying the long-term performance of [the clock spring's] composites in moist soils." J.A. 1441. Clock Spring's problem, however, is that no report in the record states, or in any way suggests, that the 1989 demonstration was designed to test durability for the purposes of the patent application to the PTO. In fact, the reports make clear that the durability testing was for "acceptance by regulators and the pipeline industry," J.A. 1444,[9] and that the 1989 installation was not dug up and examined until almost a year after the 1992 patent application. Thus, even if durability were being tested, it was not for purposes of the patent application, and cannot bring the experimental use exception into play. By filing the 1992 application, the inventors represented that the invention was then ready for patenting, and studies done thereafter cannot justify an earlier delay in filing the application under the rubric of experimental use.

Finally, Clock Spring asserts that because the Department of Transportation did not grant any installation waivers until 1993, the 1989 demonstration must have been experimental. This terse argument is unsupported by any citation to law. That the inventors were not legally allowed to perform the method on a pipeline in commercial operation, does not mean that a public use did not occur. The former fact has absolutely nothing to do with the latter question.

In summary, during the 1989 demonstration, all elements of the repair method in claim 1 of the '307 Patent were performed. There was no evidence that the overall

---

[9] See also J.A. 1379 ("Acceptance of composite repairs by the pipeline industry and its regulators needs more detailed analyses of its long-term performance under pipeline conditions.").

suitability of the '307 Patent's method nor any of the claim elements was being tested as would be required for experimental use. Accordingly, claim 1 of the '307 Patent is invalid due to prior public use.

Clock Spring has not contended that the remaining independent claims of the '307 Patent (claims 38, 39, 42, and 43) could be valid if claim 1 was invalid, under § 102(b). However, Clock Spring does argue that the dependent claims are not invalid and should have each been addressed separately. This is the first time that Clock Spring has made this argument. Wrapmaster had filed a motion for summary judgment, contending that all of the claims of the '307 Patent are invalid due to prior public use. In its opposition to Wrapmaster's motion for summary judgment, Clock Spring did not assert that the dependent claims needed to be separately addressed but, instead, essentially conceded that if claim 1 was invalid the other claims were also invalid. Clock Spring did not even address the dependent claims to the district court on review of the magistrate judge's recommendation. Clock Spring has waived its current argument that the invalidity of each of the dependent claims needs to be addressed separately.

In light of our finding of invalidity due to prior public use, we do not reach the obviousness question.

II

Clock Spring argues that the district court erred in granting summary judgment on the Lanham Act false advertising claim. In the Fifth Circuit, a Lanham Act false advertising plaintiff must demonstrate five elements as part of its prima facie case; failure to prove any element is fatal to the claim. Pizza Hut, Inc. v. Papa John's Int'l,

Inc., 227 F.3d 489, 495 (5th Cir. 2000).[10] The first element is that a false or misleading statement about a product was made. A distinction exists between claims based on literally false statements, and claims based on statements that are ambiguous or true but misleading. If a statement is ambiguous or true but misleading, the plaintiff must "introduce evidence of the statement's impact on consumers, referred to as materiality." Id. In other words, recovery on a misleading statement requires "evidence of actual deception." Id. at 497. Thus, the distinction between a literally false statement and a materially misleading statement is important. A claim based on a materially misleading statement requires proof of actual consumer deception, while in the case of a claim based on a literally false statement the court presumes the existence of deception. Pizza Hut, 227 F.3d at 497.

Clock Spring has abandoned its assertion that the two statements were materially misleading, and only argues on appeal that there are genuine issues of material fact as to whether the two statements made by Wrapmaster were literally false. This assertion does not appear in Clock Spring's complaint, and seems to have been raised for the first time in oral argument before the magistrate judge. Even if we assume that Clock Spring properly raised a claim of literal falsity, the motion for summary judgment sought summary judgment on the entire Lanham Act claim. Under these circumstances Clock Spring, which bore the burden of proof, was obligated to

---

[10] The five elements are (1) a false or misleading statement of fact about a product; (2) such statement deceived or had the capacity to deceive a substantial segment of potential consumers; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the product is in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the statement. Pizza Hut, 227 F.3d at 495.

raise a genuine issue of material fact in its opposition.  See Anderson, 477 U.S. at 250 ("Rule 56(e) provides that, when a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'") (footnote omitted).  It did not do so.

On appeal, Clock Spring asserts two distinct false advertising claims.  The first false advertising claim concerns Wrapmaster's repeated statements concerning a metal component in its wrap product: "Wrapmaster PermaWrap™ sleeves contain an embedded metallic mesh material that enhances the strength of the sleeve."

Clock Spring presented no evidence in support of its claim that this first statement was literally false.  In order to raise a genuine issue of material fact as to the falsity of the first statement, that "embedded metallic mesh material that enhances the strength of the sleeve," Clock Spring was required to present evidence addressing the material's strength.  Clock Spring relies on the 2004 report by Dr. Leewis ("the Leewis report") and a declaration from Leewis.  Neither the Leewis report nor his declaration addressed that issue.  To the contrary, the report stated that "[t]he effect of the [metal] screen is unknown and tests to evaluate the effect on overall strength will not be done in this series of tests." J.A. 1783.  Therefore, Clock Spring did not raise a genuine issue of material fact that the first statement was literally false.

The second false advertising claim concerned Wrapmaster's claim made in 2007 about the surface texture of its wrap product.  Wrapmaster's wrap has a raised diamond-shape texture on one side that is designed to nest into the diamond-shaped indentations of the next layer of wrap that covers it.  Wrapmaster stated that this "'Diamond Grip' Technology [ensures] that a mechanical locking system exists in

addition to the chemical bonding of the Adhesive. It is basically a 'belt and suspender' approach to ensure the permanence of the installation." J.A. 1825.

In support of its claim of falsity, Clock Spring relies on the Leewis declaration dated June 13, 2007, as showing the falsity of the claim that Wrapmaster's approach "ensure[s] the permanence of the installation." This declaration relies entirely on the tests documented in the 2004 Leewis report. The declaration stated that "the 'diamond' pattern exterior surface of the product . . . greatly increases the tendency of the product to unwrap from the pipe, as . . . stated [in the Leewis report]." J.A. 1833. The Leewis report describes the analysis of two samples, a "Girth Weld Repair" sample and a "Small Coiled Band Example." It goes on to analyze the surface pattern of the Wrapmaster product, stating that "[t]he diamond pattern forces the surfaces to ramp and separate . . . making it easier to break the bond." Clock Spring's problem is that the report has a 2004 date, whereas the Wrapmaster statement was made three years later in 2007. In response to the Leewis declaration and report, Wrapmaster presented an affidavit of Glenn Davis ("Davis"), Wrapmaster's president, stating that Leewis tested the wrong product. Davis stated that "[Wrapmaster's] pipe wrap product has been redesigned since Dr. Leewis prepared his 2004 report. In addition, [Wrapmaster's] pipe wrap sample Dr. Leewis used for his 2004 report was a reject sample used for display, and was not representative of the product sold to customers." Clock Spring complains that the 2004 report tested two samples and that the Davis affidavit only identified one of them as a "reject sample." Even assuming that this is accurate, Davis also stated that the product has been redesigned since 2004. There is thus no evidence that

Wrapmaster's 2007 statements about the then current product were literally false, and there is no basis for questioning Davis's credibility.

Summary judgment to Wrapmaster was appropriate because Clock Spring failed to establish even a minimal prima facie case of false advertising under the Lanham Act.

<u>AFFIRMED</u>

COSTS

No costs.